AB:JV

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – –X

UNITED STATES OF AMERICA

- against -

ERNESTO URIAH STEWART,
HENDERSON SINCLAIR JACKMAN,
and TERON OBRION FOSTER,

Defendants.

– – – – – – – – – – – – –X

**1 9 M 6 0 1**

C O M P L A I N T

(T. 21, U.S.C., § 846)

19-___-M

EASTERN DISTRICT OF NEW YORK, SS:

JERRY DINAPOLI, being duly sworn, deposes and states that he is a Special

Agent with the United States Department of Homeland Security, Homeland Security

Investigations ("HSI"), duly appointed according to law and acting as such.

On or about, and between June 19 and June 28, 2019, within the Eastern

District of New York, the defendants ERNESTO URIAH STEWART, HENDERSON

SINCLAIR JACKMAN, and TERON OBRION FOSTER, did conspire to knowingly,

intentionally, and unlawfully possess with intent to distribute a substance containing cocaine,

a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

(Title 21, United States Code, Section 846)

The source of your deponent's information and the grounds for his belief are as

follows:[1]

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary
to establish probable cause to arrest, I have not described all the relevant facts and

1.      I have been a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") since 2002.   I am currently assigned to the Conspiracy Group at John F. Kennedy International Airport ("JFK Airport").   I have participated in numerous investigations of narcotics smuggling and distribution involving international airports and individuals transporting narcotics through international airports, including JFK Airport.

2.      In connection with these investigations, HSI has been working with a confidential source ("CS").[2]

3.      On or about June 19, 2019, the CS met with STEWART at the JFK Airport Travel Plaza in a vehicle driven by the CS.   During that meeting, which was consensually recorded by the CS, STEWART and the CS negotiated the amount and price of a six-kilogram cocaine sale by STEWART to the CS, for $31,500 per kilo.

4.      During this investigation, the CS has communicated with STEWART by reaching him on a cellular telephone assigned call number (347) 262-2633 (the "Device"), which is associated with STEWART in law enforcement databases.   The CS has communicated with STEWART on the Device in several different ways, including "WhatsApp" telephone calls and messages.   WhatsApp is an electronic application that permits users to communicate in a variety of ways, including speaking to one another in real

---

circumstances of which I am aware.
          [2]      The CS is an individual who is present in the United States without legal status. The CS is cooperating with law enforcement in exchange for immigration benefits and also receives payment for his information.   As discussed below, the CS's information has been corroborated in multiple respects including by text messages, consensually recorded conversations, and direct observation by law enforcement agents.

time (essentially telephone calls) and text messages.   The communications between the CS and STEWART on the Device have generally been monitored by federal agents, consensually recorded by the CS, and have pertained to the possible sale of cocaine by STEWART to the CS.

5.     On or about 9:42 a.m. on June 26, 2019, STEWART sent a WhatsApp message to the CS advising him that STEWART would be prepared to conduct the sale on Thursday, June 27, 2019, or Friday, June 28, 2019.

6.     On or about 6:15 a.m. on June 28, 2019, STEWART sent a WhatsApp message to the CS to schedule the sale of cocaine for that same day.   At 7:03 a.m., the CS responded by proposing they meet at noon that same day at the Green Acres Mall in Valley Stream, New York.

7.     Also during the morning of June 28, 2019, the CS asked STEWART for the telephone number of STEWART'S co-conspirator who would be delivering the cocaine and picking up the payment.   At 7:04 a.m., STEWART responded "Copy", which indicates that he understood the time and location of the meeting, and then provided the cellular telephone number (929) 403-3979, a number belonging to a telephone in the possession of JACKMAN.

8.     At approximately 12 noon on June 28, 2019, JACKMAN called the CS and told the CS that he had arrived and was at the Buffalo Wild Wings store in the Green Acres Mall.   The CS told him that he was in the parking lot for the Walmart in the Green Acres Mall.   JACKMAN then walked to the Walmart parking lot, approached the CS's vehicle and entered the passenger side.

4

9.      While inside the vehicle, JACKMAN and the CS discussed the proposed
cocaine sale.   JACKMAN advised the CI that they did not have six kilograms of cocaine to
sell that day, but instead only had five and a half kilograms.   The CS agreed to proceed with
the sale.   After that agreement, JACKMAN asked to see the cash for the purchase.   The CS
refused, instead asking to see the cocaine.   After some back and forth, which was
consensually recorded by the CS, JACKMAN said that he had to call someone, exiting the car
and making a telephone call.   JACKMAN walked around the mall area for approximately 25
minutes before returning to the CS' vehicle.

10.      Upon re-entering the CS's vehicle, JACKMAN asked the CS to move
his car to another location at the Green Acres Mall to make his "boy" feel more comfortable
about proceeding with the sale.   The CS agreed.   JACKMAN directed the CS to drive them
to the parking lot of Michaels, a craft store also located at the Green Acres Mall.

11.      Once JACKMAN and the CS arrived at the Michaels parking lot,
JACKMAN exited the vehicle, telling the CS that JACKMAN would look for his "boy."
After exiting the vehicle, JACKMAN began walking across the parking lot when he spotted a
car with law enforcement agents wearing bulletproof vests.   Upon spotting the law
enforcement agents, JACKMAN hurried back to the CS's vehicle and, through an open
window, told him that he had seen law enforcement agents nearby, that the CS should stay
there, and that JACKMAN would contact him.

12.      After spotting the law enforcement agents, warning the CS and telling
the CS that he would contact him, JACKMAN then walked to Sunrise Highway, where he

was picked up by a black Porsche Sports Utility Vehicle ("SUV").   JACKMAN and the

Porsche SUV were observed and followed by law enforcement in a helicopter and vehicles.

13.   JACKMAN and the Porsche SUV were followed to a strip mall located

in Elmont, New York.   Law enforcement agents observed JACKMAN and another

individual, later identified as defendant TERON OBRION FOSTER, both exit the vehicle and

enter the rear of Hush Lounge, a bar that is under construction.   Law enforcement agents

observed FOSTER carrying something into the building.

14.   JACKMAN exited the front of the building, walked around the street in

front of the building, then walked around the side of the building to the parking lot behind the

building, and re-entered the Porsche SUV.

15.   FOSTER exited the rear of the building and re-entered the Porsche

SUV.

16.   At that point, law enforcement agents stopped the vehicle, identified

themselves as law enforcement, and asked FOSTER and JACKMAN for permission to search

the car.   FOSTER, the driver, gave law enforcement agents permission to search the car.

17.   During the search of the car, law enforcement agents found a key.   Law

enforcement agents identified that the key opened a door to the Hush Lounge.   Law

enforcement agents showed FOSTER a video of FOSTER and JACKMAN entering the rear

of the Hush Lounge with FOSTER carrying a bag into the Hush Lounge.   Law enforcement

agents also told FOSTER that they intended to seek a search warrant to see if the defendants

had hidden cocaine in the Hush Lounge.   At that point, FOSTER told the undersigned agent

that he wanted to cooperate and, in sum and substance, that he had put the drugs in the

6

basement.   FOSTER gave the agents verbal consent to open the door and retrieve the cocaine in two bags in the rear of the basement.

18.     The agents asked FOSTER if there was a gun or just cocaine in the bag, and he claimed that there was no weapon, only cocaine.   FOSTER told the undersigned agent that the key opened the door and that he put the cocaine in one of the rooms in the rear of the basement.   FOSTER told the undersigned agent that FOSTER was employed to perform construction at the Hush Lounge and that he had been given a key to access the building.

19.     Upon entering the Hush Lounge, law enforcement agents found two separate draw string bags containing five duct-taped packages.   The five packages were field tested and were found to contain cocaine.   The five packages weighed a total of 6,375.4 grams.

20.     Law enforcement agents advised JACKMAN of his Miranda rights and JACKSON initially requested to speak with an attorney, at which time questioning stopped. Approximately a half hour later, after the drugs were found in the Hush Lounge, JACKMAN said he wanted to cooperate and was willing to speak to agents without an attorney present. At that time, JACKMAN said, in sum and substance, that STEWART had been looking for six kilograms of cocaine to sell to the CS and that STEWART had asked JACKMAN if he knew anyone that they could get the cocaine from.   JACKMAN further admitted, in sum and substance, that he had told STEWART that JACKMAN would ask FOSTER if he had drugs. JACKMAN further admitted that he then asked FOSTER for six kilograms of cocaine to sell to the CS.   JACKMAN further admitted that he was going to receive $2,000 for his role in the transaction from FOSTER.

7

21.     Following his arrest, FOSTER was advised of his <u>Miranda</u> rights.   After

being advised of his Miranda rights, FOSTER stated that JACKMAN had called FOSTER on

June 27, 2019, to secure six kilograms of cocaine for FOSTER to sell.   FOSTER stated that

FOSTER had met JACKMAN on the morning of June 28, 2019, at a Key Food Supermarket

on Merrick Boulevard, and had driven JACKMAN to Buffalo Wild Wings at Green Acres

Mall.

8

WHEREFORE, your deponent respectfully requests that the defendants

ERNESTO URIAH STEWART, HENDERSON SINCLAIR JACKMAN, and TERON

OBRION FOSTER be dealt with according to law.

_____

JERRY DINAPOLI
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
29th day of J

S/ Tiscione

_____

THE HONORABLE STEVEN L. TISCIONE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK